**UNITED SCENIC ARTISTS, LOCAL 829, BROTHERHOOD OF PAINTERS AND ALLIED TRADES, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1898.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 14, 1981.

Decided May 26, 1981.

Keith E. Secular, New York City, with whom Bruce H. Simon, New York City, and Sally M. Armstrong, Washington, D. C., were on the brief, for petitioner.

Catherine Garcia, Atty. N. L. R. B., Washington, D. C., of the bar of the Supreme Court of Virginia, pro hac vice, by special leave of court, with whom Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., were on the brief, for respondent.

Before TAMM, WALD and MIKVA, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In this case a labor union challenges the finding by the National Labor Relations Board that the union violated section 8(b)(4)(ii)(B) of the National Labor Relations Act. Because we find that the result reached by the Board is not supported by substantial evidence, we reverse and remand for further proceedings.

## I. BACKGROUND

Theater Techniques, Inc. (TTI) is a general contractor that supplies theatrical settings, props, and draperies for Broadway productions, motion pictures, and television programs. Nolan Scenery Studios, Inc. (Nolan) is similarly involved in the manufacture of settings, although primarily in the painting[1] of scenery and props. Although Nolan has on occasion acted as a general contractor, its usual contractual relationship with TTI from January of 1977 to June of 1978 was that of subcontractor for the painting of scenery and props provided by TTI.

Nolan is a party to a collective bargaining agreement with United Scenic Artists, Local 829 of the Brotherhood of Painters and Allied Trades, AFL–CIO (Local 829 or Union). This agreement contained the following relevant clause:

For the purpose of clarification, it is specifically provided herein that the jurisdiction of the Union shall include all Scenic Artists' work for Broadway Productions, "Off-Broadway," Resident and Regional Theatres ... etc. This includes painting and application of all decorative material when applied by any means including all scenic creative art work, whether applied by painting or otherwise. It is agreed between the parties that the jurisdiction of the Union with regard to sculpturing shall include drawings, pounces and application of pounces, modeling or sculpturing over and above the rough blocking, in accordance with past practice.

Joint Appendix (J.A.) at 321. Nolan's president, Arnold Abramson, stated his understanding that this agreement prohibited his company from subcontracting out any sculpturing work that had been assigned to it. J.A. at 150.

The alleged unfair labor practice at issue here involved the painting of scenery for a show entitled "Stop the World I Want to Get Off." TTI entered into a contract with Nolan on April 26, 1978 for the painting of certain elements for this show. Exhibit 3A, J.A. at 308–09. Other elements were added by a separate contract dated April 28, 1978. Exhibit 3B, J.A. at 310–11. TTI shipped the necessary props and materials to Nolan on May 3 and 8. Included within the last shipment were the design sketches and materials necessary to construct the "environment unit." At least four pieces of sculpture had to be created as a part of this unit. Nolan fabricated two of these pieces while two props, a dragon's head and an airplane, arrived at Nolan already fabricated.

On May 9, Abramson telephoned the president of TTI, Peter Feller, to inform him that Nolan employees refused to work on those two prefabricated props. Abramson informed Feller later that day that a Union representative would visit the Nolan plant and that Abramson would see that the props were painted. Doug LeBrecht, assistant business representative for the Union, visited the plant on May 9 and spoke separately with Abramson, Nolan employees, and the designer for the show in question.

---

1. The meaning of the term "painting" was disputed in this case. E. g., Joint Appendix (J.A.) 257–59, 273–74. Unless otherwise stated, the term is used in its ordinary meaning in this opinion.

Abramson testified that he informed Le-Brecht that the props had come from TTI. *United Scenic Artists, Local 829,* 243 N.L. R.B. No. 7 (June 25, 1979) (*Board Decision* ), J.A. at 6.

On May 10, Abramson telephoned the Union business representative, Domingo Rodriguez, about the two prefabricated props. Rodriguez gave his permission for the painting of the props by Nolan employees but told Abramson that Nolan had violated the collective bargaining agreement which, Rodriguez asserted, entitled Nolan's employees to all of the sculpturing work. Rodriguez also informed Abramson that Nolan would be assessed a certain monetary amount based upon an estimate of the amount of time it would have taken Nolan employees to fabricate the props. Feller testified that Abramson subsequently informed him that the Union planned to charge Nolan in the future for painting props fabricated elsewhere as if Nolan employees had actually executed them. On May 11, Rodriguez sent a telegram to Abramson that stated:

> It has come to our attention that you intend to paint sculpture which has not been produced by scenic artists employed by you. Painting of such sculpture constitutes a flagrant violation of Section 1 of the collective bargaining agreement between United Scenic Artists Local 829 and Theatrical Contractors Association Inc. to which you are a party. We demand that any and all work on such sculpture be stopped immediately and that you immediately comply with your contractual commitments.
>
> It has also come to our attention that Nolan has entered into an illegal conspiracy with Theatre Techniques, Inc. [TTI] to deprive scenic artists of work opportunities. Please be advised that this Union will take appropriate action to the maximum extent permitted by law to counteract the effects of your improper activities.

J.A. at 320.

TTI filed charges before the Board on May 12, alleging that the Union had encouraged the refusal of Nolan employees to paint certain props sent by TTI to Nolan

and that the Union had threatened Nolan with a financial penalty should it continue to paint props from TTI; a complaint issued on June 7. The Administrative Law Judge, after hearing evidence and considering the parties' briefs, found that the Union had induced or encouraged a work stoppage in violation of section 8(b)(4)(i)(B) and violated the secondary boycott provision, section 8(b)(4)(ii)(B). National Labor Relations Act (Act), 29 U.S.C. §§ 158(b)(4)(i)(B) & (ii)(B) (1976). *United Scenic Artists, Local 829,* Case 2–CC–1553, Decision of the Administrative Law Judge (Sept. 22, 1978) (*ALJ Decision* ), J.A. at 15–30. A Board panel, after evaluating exceptions to this decision, reversed the ALJ's decision as to the work stoppage violation, but upheld his finding of a violation of the secondary boycott provision. *Board Decision,* J.A. at 4–14. The Union petitioned for review of this decision and order; the Board cross-petitioned for enforcement.

## II. DISCUSSION

The "secondary boycott" provision of the Act states simply that it shall be an unfair labor practice for a labor organization or its agents "to threaten, coerce, or restrain any person engaged in commerce" where "an object thereof is—forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . ." 29 U.S.C. § 158(b)(4)(ii)(B) (1976). The Union attacks the Board's decision that it violated this provision on two fronts. First, the Union argues that it possessed no "secondary" objective but was concerned only with the preservation of work for its members. Second, the Union contends that the conduct of its business representative did not amount to threats, coercion, or restraint within the meaning of the Act.

█ The Supreme Court has made clear that section 8(b)(4)(ii)(B), despite its broad language, does not ban all union actions that may cause a cessation of business between employers. Instead, only union ac-

tivity with a "secondary" objective is prohibited. *NLRB v. Enterprise Association of Pipefitters, Local 638,* 429 U.S. 507, 510, 97 S.Ct. 891, 894, 51 L.Ed.2d 1 (1977); *National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). The evaluation of activity as primary or secondary depends upon whether the activity was " 'addressed to the labor relations of the contracting employer *vis-a-vis* his own employees,' *National Woodwork, supra,* at 645, 87 S.Ct. at 1268, and is therefore primary conduct, or whether the [activity] was 'tactically calculated to satisfy union objectives elsewhere,' 386 U.S., at 644, 87 S.Ct. at 1268, in which event the [activity] would be prohibited secondary activity." *Enterprise,* 429 U.S. at 511, 97 S.Ct. at 894–95. The secondary objective need not, however, be the union's *sole* objective for the activity to be prohibited. *Enterprise,* 429 U.S. at 530 n.17, 97 S.Ct. at 904 n.17; *Local 644, United Brotherhood of Carpenters v. NLRB,* 533 F.2d 1136, 1149 (D.C.Cir.1975).

The Board began its analysis of the union activity here by pointing out the well-established principle that "Section 8(b)(4)(ii)(B) is violated where a union employs unlawful pressure to claim work that the immediate employer is not in a position to award." J.A. at 10. In *Enterprise* the Supreme Court upheld the Board's determination that the union of steamfitters had violated the statutory provision at issue here when it refused to install climate-control units because the factory-installed internal piping on the units violated its collective bargaining agreement which provided that the piping be done by the steamfitters. There, similar to the case at hand, the general contractor had specified the installation of particular units and the subcontractor, the employer organized by the union, had no contractual right to select other units. The Court held that the Board's emphasis upon this "right to control" was a matter within its discretion and did not constitute "a departure from the totality-of-the-circumstances test recognized in *National Woodwork.*" 429 U.S. at 524, 97 S.Ct. at 901.

The Union argues in this court that *Enterprise* is distinguishable because here Ro-

driguez, the Union representative, possessed a reasonable, good faith belief that Nolan, rather than TTI, had the right to control the disputed work. Rodriguez testified that he believed that Nolan had the painting contract for the show in question and therefore control over whatever sculpting was to be done. J.A. at 231–32, 257. The ALJ found the whole of Rodriguez's testimony "unreliable," however, J.A. at 20, and the Board found no reason to overturn credibility determinations made by the ALJ. J.A. at 4 n.1. Were this merely a question of credibility, we would agree that it is properly left to the ALJ and the Board. *Amalgamated Clothing Workers v. NLRB,* 527 F.2d 803, 806 (D.C.Cir.1975), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976).

■ Resolution of credibility questions does not provide us, however, with the necessary record evidence to support the foundation upon which the Board apparently based its decision. An examination of that decision suggests that the Board, ignoring Rodriguez's discredited testimony, assumed that the Union knew the terms of this particular contractual relationship and therefore the locus of the "right of control." As the record now stands, substantial evidence cannot be found to support this unstated assumption. Even apart from Rodriguez's direct testimony that he had no knowledge of TTI's contractual control over the sculpturing work in question, J.A. at 231, 237, 265, much of the evidence on this point suggests that the Union did not know the provisions of the contract. For example, record evidence suggests that Local 829 had no way of knowing the existence of subcontractual arrangements on particular shows. J.A. at 84, 149. In this case, moreover, Rodriguez testified that the shop report filed on Nolan made no mention of any involvement by TTI. J.A. at 213–15.

Record evidence upon which the Board might have based its unstated inference includes the apparent understanding by Abramson of TTI's absolute right of control, J.A. at 125, and the visit by the assistant union representative LeBrecht to Nolan

during which LeBrecht spoke with scenic artists, Abramson, and the designer of the show. J.A. at 18, 129. Although Abramson stated that he informed LeBrecht that the props had come from TTI, J.A. at 130, nothing in the record before us contradicts Rodriguez's assertion that Abramson told him only that the designer "had requested" that TTI execute the pieces in question rather than Nolan. J.A. at 232. This record is therefore inadequate to support an unstated assumption drawn by the Board that the Union had knowledge of TTI's complete control over the disputed work. *NLRB v. Yeshiva University*, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980); *NLRB v. General Telephone Directory Co.*, 602 F.2d 912, 920 (9th Cir. 1979).

Underlying the Board's decision in this case, however, may be an implicit holding that the Union's mistaken belief as to the locus of the right of control fails to constitute an adequate defense to the charged 8(b)(4)(ii)(B) violation. Because the Board's decision does not reveal that it explicitly addressed this issue,[2] we will not decide this troublesome question. We note in passing, however, that to allow a good-faith but mistaken belief that the pressured employer had the contractual right of control in such a situation to constitute a defense to an alleged violation of section 8(b)(4)(ii)(B) would appear to comport best with the statutory requirement of a secondary "object." *But see General Truck Drivers, Local 85*, 243 N.L.R.B. No. 94 (1979); *National Association of Broadcast Employees, Local 31*, 237 N.L.R.B. 1370, 1379 (1978), *enforced*, 631 F.2d 944 (D.C.Cir.1980).

Because we reverse and remand for further proceedings, we have no occasion to reach two further troubling questions raised by this case. First, unlike *Enterprise*, the economic "pressure" exerted by the Union in this case was in the form of a request for estimated hours for the purpose of calculating a monetary assessment. In essence, the Union made known its request for "premium pay" for painting the prefabricated props. The Union contends that

such a request of an immediate employer, even where the employer is powerless to award the disputed work, constitutes primary activity. *See Local 742, United Brotherhood of Carpenters v. NLRB*, 533 F.2d 683 (D.C.Cir.1976), *vacated* and remanded in light of *Enterprise*, 430 U.S. 912, 97 S.Ct. 1322, 51 L.Ed.2d 590 (1977). *But see Local 742, United Brotherhood of Carpenters*, 237 N.L.R.B. 564 (1978) (Board action upon remand). The Union also contends, moreover, that the mere request for an estimate of hours in this case, without more, does not rise to the level of "coercion" made unlawful by section 8(b)(4)(ii)(B). We intimate no position on these issues.

### III. CONCLUSION

Our statutory duty in this case is to examine the administrative record to determine whether the result reached by the Board is "supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 160(e) (1976). Taking care not to substitute our own view of the facts, we cannot discover adequate record evidence supporting the apparent, albeit unstated, assumption made by the Board that the Union in this case knew that TTI possessed absolute contractual control over the disputed work. Upon remand the Board must at least develop adequate evidentiary support for this assumption. Should some alternative rationale underlie the Board's decision here, however, fuller explication of such a rationale is required. Only after the basis of the Board's decision is made clear can meaningful judicial review occur. The decision of the Board is therefore reversed and the case remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

2. As appellate counsel for the Board noted at oral argument, the Board seemingly did not "address the situation of a bona fide belief that Nolan had controlled it all from the beginning and subcontracted a part away."