UNITED SCENIC ARTISTS, LOCAL 829, BROTHERHOOD OF PAINTERS AND ALLIED TRADES, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 83–2135.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 3, 1984.

Decided May 24, 1985.

Keith E. Secular, New York City, with whom Sally M. Armstrong, Washington, D.C., was on brief, for petitioner.

Lawrence E. Blatnik, Atty., N.L.R.B., with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on brief, for respondent.

Before MIKVA and BORK, Circuit Judges, and HAROLD H. GREENE,* District Judge.

Opinion for the Court filed by District Judge HAROLD H. GREENE.

HAROLD H. GREENE, District Judge.

This case is before the Court for a second time on review from a decision of the National Labor Relations Board (the Board or NLRB) that the United Scenic Artists Local 829 of the Brotherhood of Painter and Allied Trades, AFL–CIO (Local 829) violated section 8(b)(4)(ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(ii)(B), the "secondary boycott" provision.[1] In the first review proceeding, this Court, in an opinion authored by Judge Tamm, reversed the Board's decision and remanded, holding that the agency decision could be sustained only on the basis of new evidence or a new, valid legal theory. *United Scenic Artists, Local 829 v. NLRB,* 655 F.2d 1267 (D.C.Cir.1981). Finding that no additional evidence was adduced and that the Board's new theory is legally flawed, we reverse once again.

I

The underlying facts are as follows.[2] Theatre Techniques, Inc. (TTI), a general contractor that supplies theatrical settings, frequently subcontracted with Nolan Scenery Studios, Inc. (Nolan) for the painting of scenery and props provided by TTI. Nolan, but not TTI, was a party to a collective

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Local 829 has asked the Court to set aside those portions of the Board's decisions which found the union in violation of the Act; the Board has cross-petitioned for enforcement of its order.

2. A fuller recital of the facts is found in our previous opinion.

bargaining agreement with Local 829 which gave the union jurisdiction over both the painting and sculpturing of props.[3]

Specifically involved here is a 1978 contract between TTI and Nolan for the painting of scenery for a Broadway show. This scenery included several props which required both sculpture and painting. When the props arrived at the Nolan studios, it became apparent that some of them had already been sculpted by TTI personnel. Relying upon their collective bargaining agreement with Nolan, some of Nolan's employees refused to paint the props that had previously been sculpted. Shortly thereafter, Domingo Rodriguez, the union's business agent, spoke about the dispute with Nolan's president.[4] While giving permission for the painting of the props by the Nolan employees, Rodriguez informed Nolan that it had violated the collective bargaining agreement, and that it would accordingly be assessed a monetary amount for the time it would have taken Nolan employees to fabricate the props.[5] No one from Nolan advised Local 829 that Nolan had a contract with TTI which gave the latter the right to control the sculpturing work.

TTI filed secondary boycott charges, which were upheld both by an administrative law judge and by the Board.[6] The Board found unlawful coercion within the meaning of section 8(b)(4)(ii)(B) in the union's demand that Nolan stop painting scenery and props not fabricated by Nolan employees and its request for an estimate of hours for the purpose of calculating a monetary assessment against Nolan. The Board further found that the union's request for "premium pay" was made in order to force Nolan to stop painting prefabricated props supplied to it by TTI and thereby to force TTI, a neutral employer, to change its manner of doing business. On the basis of these findings, the Board concluded that Local 829 had violated the Act in that its action was "tactically calculated to satisfy union objectives elsewhere, and was, therefore, secondary and unlawful."[7]

Local 829 petitioned for review of this decision and order, and the Board cross-petitioned for enforcement. Upon its examination of the administrative record, this Court determined that the evidence did not support the Board's apparent assumption that Local 829 knew that TTI, rather than the immediate employer Nolan, possessed contractual control over the disputed work. More specifically, we noted that "much of the evidence on this point suggests that the Union did not know the provisions of the contract." 655 F.2d at 1270. In fact, Rodriguez, the only union representative to have made any kind of demand upon No-

---

3. The collective bargaining agreement provided in relevant part that

> For the purpose of clarification, it is specifically provided herein that the jurisdiction of the Union shall include all Scenic Artists' work for Broadway Productions, "Off-Broadway," Resident and Regional Theatres ... etc. This includes painting and application of all decorative material when applied by any means including all scenic creative art work, whether applied by painting or otherwise. It is agreed between the parties that the jurisdiction of the Union with regard to sculpturing shall include drawings, pounces and application of pounces, modeling or sculpturing over and above the rough blocking, in accordance with past practice.

J.A. at 321. Nolan's president testified in the Board proceeding that he understood that this clause prohibited his company from subcontracting out any sculpturing work that had been assigned to it. J.A. at 150.

4. The previous day, Douglas LeBrecht, another union representative, had also discussed the matter with the Nolan president. However, all parties agree that LeBrecht made no demands upon anyone.

5. Rodriguez made these statements in the course of a telephone call initiated by Nolan's president. In a subsequent telegram, Rodriguez advised Nolan that the union would take "appropriate action to the maximum extent permitted by law to counteract the effects of your improper activities." J.A. at 320.

6. The original TTI claim also included an allegation that Local 829 had induced or encouraged a work stoppage in violation of section 8(b)(4)(i)(B). While this charge was sustained by the ALJ, it was reversed by the Board.

7. Board Decision of June 25, 1979 at 7, J.A. at 10.

lan, testified that he had no knowledge of TTI's contractual control, that he believed that Nolan, which had the painting contract, also controlled whatever sculpting was to be done, and that Local 829 believed that Nolan had permitted the sculpturing to be done by TTI in violation of the collective bargaining agreement.[8]

Nevertheless, relying upon credibility determinations made by the ALJ, the Board decided to ignore the Rodriguez testimony[9] and to assume that the union knew the terms of the contractual relationship between TTI and Nolan and therefore knew the locus of the "right of control." We concluded that the record did not contain substantial evidence to support such an assumption, and on that basis we remanded the case to the Board for further proceedings. In so doing, we directed the Board either to develop adequate evidentiary support for its assumption or to explicate what, if any, alternative rationale supported its decision.[10]

Following the remand, on August 26, 1983, the Board, without having reopened the proceeding to take additional evidence, issued a Supplemental Decision and Order in which it reaffirmed its earlier finding that Local 829 had engaged in unlawful secondary conduct. Having failed to take new evidence, the Board cannot, in the face of this Court's previous determination to the contrary, justify its decision on the basis of its earlier theory and the existing evidence,[11] but it must rely on the alternative the Court offered—a new rationale.

The Board has adopted and proffers for our consideration a new rationale for its decision. Under the Board's test, in order to make out a *prima facie* case under section 8(b)(4)(ii)(B), the general counsel is not required to establish that a union knew when it exerted pressure on an employer that he lacked control over the disputed work. Rather, in the view of the Board, when a union coerces a neutral employer it must be presumed to have knowledge of that employer's neutral status. It follows, according to the Board, that once the neutrality of an affected employer has been established by the general counsel, the burden shifts to the union to demonstrate that it possessed a reasonable good-faith belief that the primary employer had control over the disputed work. Moreover, that burden would be "high" and could only be met in "extraordinary circumstances," i.e., by evidence establishing that, before the union exerted pressure, it was either denied access to information of the employer's neutrality or deliberately misled. Finally, the Board noted that it "[did] not envision that the instances in which this defense will be found meritorious will be many." Board Decision on August 26, 1983 at 14, J.A. at 17a.

Applying this standard to the instant case, the Board found that Local 829 had failed to rebut the general counsel's *prima facie* showing because it had not shown that it had been denied access to information concerning Nolan's lack of contractual control or that it had been affirmatively misled in that regard. The Board therefore concluded that "an object of [Local

---

**8.** Nolan appears to have contracted out bargaining unit work on at least two prior occasions. J.A. at 151–53, 208–10, 220–29.

**9.** The Board concedes that it declined to credit any of Rodriguez's testimony "even though it was not directly contradicted by any other witness." Appellee's Brief at 30 n. 14. In fact, no witness, union or otherwise, testified that Local 829 knew that TTI had the right to control the sculpturing work.

**10.** We also stated that, should such a new rationale be developed, a full explanation would be required to permit meaningful judicial review.

**11.** Contrary to the Board's belief that "the circuit court has questioned our earlier interpretation of the record" (J.A. at 17a), we concluded, not that the Board's interpretation of the evidence was inadequate, but that the evidence itself was insufficient to sustain the Board's conclusion. We said, accordingly, that the Board must, on remand, "at least develop adequate evidentiary support" for its assumption that the Union knew that TTI possessed contractual control over the disputed work. 655 F.2d at 1271.

829's] conduct must have been the unlawful one of influencing TTI." [12]

## II

It is clear from this history that the basic issue before the Court is whether the Board may, consistently with the Act, impose upon a labor union the burden of ascertaining, before engaging in coercive activity, whether the immediate employer with whom it has a labor dispute is, in fact, neutral. In our view, the Board's approach cannot be squared with the language of the statute, its purposes, or the precedents.

■ Section 8(b)(4)(ii)(B) provides [13] that two requirements must be satisfied before the Board may find that a union has engaged in an unfair labor practice: (1) it must have been an object of the challenged union conduct to require a neutral employer to cease doing business with the employer with whom the union is engaged in a dispute, and (2) the union must have pursued this object by threatening, coercing, or restraining the neutral employer. *Soft Drink Workers Union Local 812 v. NLRB*, 657 F.2d 1252, 1261 (D.C.Cir.1980); see generally, R. Gorman, Labor Law, Chap. XII, § 1 (1976).

We will assume for purposes of this opinion that the activities of Local 829 satisfied the second part of the test, although that issue is hotly disputed.[14] The question here, then, is how the secondary object element of the statute may properly be established.

■ The language of section 8(b)(4)(ii)(B) is plain. It does not permit the Board to find that a labor organization is guilty of a secondary boycott unless it is an "object" of the union activity to pressure a neutral employer. In other words, as the Supreme Court has explained, this provision does not proscribe all union activities which may be designed to cause a cessation of business: it prohibits only those activities which have a "secondary objective"— that is, activities which are "tactically calculated to satisfy union objectives elsewhere." *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612, 644, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967).

■ The term "object" as it is found in the statute,[15] or the words "tactically calculated ... objectives" as the Supreme Court paraphrased it in *National Woodwork Manufacturers*,[16] are generally taken as

---

**12.** Board Decision of August 26, 1983 at 18, J.A. at 21a.

**13.** That section provides in relevant part that

> It shall be an unfair labor practice for a labor organization or its agents—
>
> to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce where ... an object thereof is—
>
> forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer or to cease doing business with any other person, ... *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

**14.** Local 829 argues now, as it did in the first review proceeding, that it did not threaten or coerce Nolan within the meaning of section 8(b)(4)(ii)(B) because it took no coercive action, such as a strike. As in our previous decision, we do not decide that issue, nor do we decide whether a request for premium pay of the pri-

mary employer is prohibited secondary activity. See *United Scenic Artists, supra,* 655 F.2d at 1271.

**15.** It is an elementary principle of statutory construction that ordinarily the plain meaning of statutory language controls, *i.e.,* "words should be given their common and approved usage." 2A *Sutherland Statutory Construction* § 46.06 at 74 (4th ed. 1984). No reason has been suggested to us why that principle should not govern here.

**16.** The NLRB itself used similar language in this case, stating that the activities of Local 829 were "tactically calculated" to satisfy union objectives other than with the primary employer (J.A. at 10), that no evidence "effectively counters the inference that [the Union] knew that Nolan lacked control of the disputed work" (J.A. at 17a), and that "an object of [the Union's] conduct must have been to influence TTI." J.A. at 21a. It is difficult to see how an action can be tactically calculated to achieve an objective when the actor does not know that the objective exists.

synonyms for "purpose." [17] On that basis, it has been held in the secondary boycott cases that the union's "improper motive and intent" must be established; [18] that the union's conduct must "reveal[ ] a specific intent to involve neutrals in labor disputes not their own"; [19] and that a union violated section 8(b)(4)(ii)(B) when it "purposefully picketed and handbilled the entire [jobsite] in order to influence neutral individuals ...." [20]

■ If any doubt remained that it is the union's intent, not the effect of its actions, that is critical to the resolution of a secondary boycott charge, it is dispelled by a recent decision of this Court which held that "[t]he Board must ... establish that union conduct reveals a specific intent to involve neutrals in labor disputes not their own in order to establish a secondary boycott violation," and that "[t]he ultimate inquiry focuses on the intent of the union, not the effects of its actions." *Local Union 501, International Brotherhood of*

*Electrical Workers, AFL–CIO v. NLRB,* 756 F.2d 888, 893 (D.C.Cir.1985).[21]

■ In short, inasmuch as the statute requires a showing of a purpose to coerce a neutral employer, the Board may make an unlawful secondary boycott determination only if it is able to find that the union had such a purpose; a finding that the union's actions affected a neutral employer is not sufficient.

### III

The Board here sought to discharge its responsibility with respect to the "object" element of the statute by means of a presumption. It decided that if a union is not denied access to information and if it is not affirmatively misled concerning the issue of control, it must be presumed to have had knowledge of the neutral status of the controlling employer and thus to have had an unlawful secondary object. That theory is unsound as a matter of law and of logic.

17. Purpose, intent, and object language is distinguished under the Act, as it is in law generally, from language describing activities which merely have a particular effect. See *NLRB v. Local 58, International Brotherhood of Electrical Workers, AFL–CIO,* 638 F.2d 36, 37 (6th Cir. 1981) ("The controlling factor in determining the legality of picketing is not its effect, but its object."); *Texas Distributors, Inc. v. Local Union 100, United Association of Journeymen,* 598 F.2d 393, 398 (5th Cir.1979); *Electro-Coal Transfer Corp. v. General Longshore Workers, Local 1418 and 1419,* 591 F.2d 284, 290 (5th Cir.1979). More generally, see also, for example, *City of Lockhart v. United States,* 460 U.S. 125, 130, 103 S.Ct. 998, 1001, 74 L.Ed.2d 863 (1983); *City of Port Arthur, Texas v. United States,* 459 U.S. 159, 168, 103 S.Ct. 530, 535, 74 L.Ed.2d 334 (1982); *McKay v. Hammock,* 730 F.2d 1367, 1373–74 (10th Cir.1984).

Additionally, in actions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* the Supreme Court has consistently distinguished disparate treatment cases from cases involving facially neutral employment standards that have a disparate impact on minority applicants. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 713, n. 1, 103 S.Ct. 1478, 1481, n. 1, 75 L.Ed.2d 403 (1983), citing *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252, n. 5, 101 S.Ct. 1089, 1093, n. 5, 67 L.Ed.2d 207 (1981); *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802, n.

14, 93 S.Ct. 1817, 1824, n. 14, 36 L.Ed.2d 668 (1973).

18. *Sherman Oaks Medical Arts Center, Ltd. v. Carpenters Local Union 1936,* 680 F.2d 594, 597–98 (9th Cir.1982).

19. *Local Union 501, International Brotherhood of Electrical Workers, AFL–CIO v. NLRB,* 756 F.2d 888, 893 (D.C.Cir.1985).

20. *NLRB v. National Association of Broadcast Employees Local 31,* 631 F.2d 944, 952 (D.C.Cir. 1980).

21. That case involved common situs picketing. The Board concluded that the union had violated the Act by failing to restrict its pickets to a plant gate reserved for the employees of the primary employer, picketing a reserved neutral gate instead. Nevertheless, the Court found, based on the totality of the circumstances surrounding the union's conduct, that there was no substantial evidence to support the Board's finding of an illegitimate secondary intent. See also, *Abreen Corp. v. Laborers' International Union,* 709 F.2d 748, 755 (1st Cir.1983), cert. denied sub nom. *Massacusetts Laborers District Council Local 609 v. Abreen Corp.,* —— U.S. ——, 104 S.Ct. 702, 79 L.Ed.2d 167 (1984); *Lane Crane Service, Inc. v. International Brotherhood of Electrical Workers, Local· 177,* 704 F.2d 550, 553 (11th Cir.1983).

■ Presumptions may, of course, be established both by legislative bodies and by administrative agencies, but their validity depends as a general rule upon a rational nexus between the proven facts and the presumed facts. McCormick *Evidence* 3d ed. (1984) § 344 at 969; *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 28, 96 S.Ct. 2882, 2898, 49 L.Ed.2d 752 (1976); *Bandini Petroleum Co. v. Superior Court*, 284 U.S. 8, 19, 52 S.Ct. 103, 107, 76 L.Ed. 136 (1931); *Mobile, Jackson & Kansas City Ry. Co. v. Turnipseed*, 219 U.S. 35, 43–44, 31 S.Ct. 136, 138, 55 L.Ed. 78 (1910); *United States Steel Corp. v. Oravetz*, 686 F.2d 197, 201–02 (3d Cir.1982). Where such a nexus is lacking, the presumption is invalid. *United States Department of Agriculture v. Murry*, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Holland Livestock Ranch v. United States*, 543 F.Supp. 158 (D.Nev.1982), *aff'd*, 714 F.2d 90 (9th Cir.1983); *United States v. Murff*, 265 F.2d 504, 506 (2d Cir.1959); *Owens v. Roberts*, 377 F.Supp. 45, 54–55 (M.D.Fla. 1974).

■ This rule has in various circumstances been relaxed with respect to legislative presumptions. Since presumptions established by a legislature must normally survive scrutiny only on due process grounds, they have sometimes been upheld even if they were not based on probabilities but rather on policy. McCormick *Evidence, supra*, § 345 at 985. However, an administrative agency's presumptions do not enjoy a similar protection: such an agency is not free to ignore statutory language by creating a presumption on grounds of policy to avoid the necessity for finding that which the legislature requires

to be found. See *Atchison, T. & S. F. Ry. Co. v. ICC*, 580 F.2d 623, 629 (D.C.Cir. 1978).

These general principles have applicability to the NLRB. The Supreme Court has held on several occasions that a presumption created by the Board is subject to judicial review "for consistency with the Act, and for rationality." *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 787–90, 99 S.Ct. 2598, 2606–07, 61 L.Ed.2d 251 (1979) ("It is, of course, settled law that a presumption adopted and applied by the Board must rest on a sound factual connection between the proved and inferred facts"); see also, *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978); *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 804–05, 65 S.Ct. 982, 988–89, 89 L.Ed. 1372 (1945).

■ For the reasons discussed above, it is clear that the presumption the Board attempted to establish in this case is not consistent with the Act.[22] Indeed, the Supreme Court has struck down an NLRB-created presumption in a similar context on grounds of inconsistency with the statute.

In *Local 357, International Brotherhood of Teamsters v. NLRB*, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), the Court considered a Board determination that a hiring hall agreement was presumptively unlawful under section 8(a)(3) of the Act[23] if it did not include certain protective provisions relating to discrimination. As the Court analyzed it, the Board sought to dispense with proof of the union's intent or motive by imposing an affirmative duty upon it and by inferring a violation of the statute from a breach of that duty. The Court squarely rejected that attempt, stating that where the dispositive issue is the

---

**22.** It might be noted that, while in our prior opinion herein we were unwilling to decide whether the union's mistaken belief as to the locus of the right of control was an adequate defense to a secondary boycott charge, we did indicate even then that

[T]o allow a good-faith but mistaken belief that the pressured employer had the contractual right of control in such a situation to constitute a defense to an alleged violation of

section 8(b)(4)(ii)(B) would appear to comport best with the statutory requirement of a secondary "object."

655 F.2d at 1271.

**23.** That provision makes it an unfair labor practice for an employer or a union to encourage or discourage membership in labor organizations by means of discrimination.

union's "true purpose" or "real motive" for a hiring or firing decision, "the Board is confined to determining whether discrimination has in fact been practiced. If hiring halls are to be subjected to regulation that is less selective and more pervasive, Congress not the Board is the agency to do it." 365 U.S. at 675, 677, 81 S.Ct. at 839, 840.

Likewise clear is the factual irrationality of the Board's presumption. The conclusion (that the union's object must have been to influence the neutral employer) simply does not follow from the premise (that the union was not denied access to the relevant information and that it was not misled). As this case demonstrates, it is at least as likely that the union believed, albeit mistakenly, that the primary employer controlled the disputed work,[24] and that its object was therefore to influence that employer, not a neutral party.

Nevertheless, under the Board's present rationale, in the absence of a prior investigation, the union's actual objective is irrelevant: a secondary objective is presumed as matter of law, whether or not this squares with the actual facts and the relationships between and among the various parties,[25] and that presumption can be overcome only in "extraordinary circumstances."

■ On the basis of the principles discussed above, we hold that the creation of

such a presumption is beyond the Board's statutory authority.[26]

## IV

The NLRB responds by pointing to a number of decisions, principally *NLRB v. Enterprise Association of Steam Pipefitters, Local 638 (Enterprise)*, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977). However, none of these cases supports the Board's position.

To be sure, in *Enterprise* the Supreme Court upheld the Board's finding of a secondary boycott on the basis that the union's objective was not confined to the employment relationship with its immediate employer, the subcontractor, but also included that of influencing a neutral. However, unlike here, the union in *Enterprise* did not and could not contend that it believed that the primary employer completely controlled the assignment of the disputed work. Not only was the neutral employer, the general contractor, present at the job site but there was evidence that the union approached that employer directly with its demand that internal piping work be performed by union members. 429 U.S. at 512–13, 97 S.Ct. at 895–96.[27] The Board's own decision in *Enterprise* emphasized the fact that the union knew that Austin had the right to control:

> Hudick [the primary employer] was incapable of assigning its employees this work; such work was never Hudik's to

**24.** As the evidence cited above suggests, that is what Local 829 believed with respect to Nolan.

**25.** The union representative in this case actually inquired whether Nolan, the primary employer, "didn't have the contract to do that work." Testimony of Rodriguez, J.A. at 231.

**26.** Our conclusion with respect to the Board's improper imposition of a presumption should not be taken to mean that the general counsel must necessarily produce direct evidence of the union's subjective intent or secondary objective; *i.e.*, an admission by a union official. Purpose may be proved circumstantially, that is, from the nature of the acts. See *Local 357, International Brotherhood of Teamsters v. NLRB*, supra, 365 U.S. at 675, 81 S.Ct. at 839; *Local 761, International Brotherhood of Electrical, Radio and Machine Workers, AFL–CIO v. NLRB*, 366

U.S. 667, 674, 81 S.Ct. 1285, 1290, 6 L.Ed.2d 592 (1961); *Soft Drink Workers Union Local 812 v. NLRB*, 657 F.2d 1252, 1261–62 (D.C.Cir.1980); *Allied Concrete, Inc. v. NLRB*, 607 F.2d 827, 830 (9th Cir.1979). But what the Board may not do is what it attempted to do in this case: to charge the union with a secondary boycott when there is no credible evidence, direct or circumstantial, that it had a secondary object. To do so is impermissibly to eliminate the requirement of a secondary object and to substitute therefor that of a secondary effect.

**27.** The Supreme Court concluded that the "commonsense inference from these facts is that the product boycott was in part *aimed at* securing the cutting and threading work at the [job], which could only be obtained by exerting pressure on Austin." 429 U.S. at 531, 97 S.Ct. at 905 (emphasis supplied).

assign in the first place. Moreover, we note that the [union] informed Austin [the neutral], who did not employ employees represented by the [union], that it would *not* let Hudik install the climate control units involved. Considered together, these facts clearly indicate that [the union] was exerting prohibited pressure on Hudik with an object of either forcing a change in Austin's manner of doing business or forcing Hudik to terminate its subcontract with Austin.

*Enterprise Association of Steamfitters,* 204 NLRB 760 (1973). Thus, if anything, *Enterprise* confirms the significance of a union's knowledge or lack of knowledge of the locus of control in a secondary boycott case.

The other common situs picketing cases upon which the Board relies are similarly inapposite.[28] In all of these cases the union knowingly involved a second employer in its labor dispute with a primary employer.[29] Under these circumstances, it is entirely appropriate to require a union which has chosen to take its appeal to a site occupied by a neutral to ascertain whether the primary employer is, in fact, present and to limit the effect of its appeal to the employer with whom it has the primary dispute. See note 26, *supra*.[30]

Here, by contrast, the union's conduct was restricted to a contact with Nolan, the primary employer.[31] There was no evidence that Local 829 approached TTI or in any other way attempted to involve TTI in its dispute with Nolan, and there likewise was no evidence that the union knew that TTI had actual control over the disputed work. The Court has been made aware of no case prior to this one where either the Board or a court has found a violation of the secondary boycott provision under circumstances such as these.

Similarly unpersuasive are the Board's "practical" arguments for shifting the burden of proof to the union.[32] The Board's conclusion that a union which is not misled or denied access to the relevant information must bear the burden of a mistake might be reasonable if, as a matter of common sense, a union, rather than the primary employer, had superior knowledge. That, however, is not so.

An employer who is pressured by a union to do something which he is incapable of doing (because someone else has control of the work) can quite simply inform the union of that fact. He knows that he has no control; he therefore also knows, far better than does the union, that the union's activities would affect a neutral

---

**28.** See *Local 761, International Union of Electrical, Radio and Machine Workers, AFL–CIO v. NLRB,* 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); *NLRB v. Denver Building and Construction Trades Council,* 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); *National Association of Broadcast Employees and Technicians, Local 31,* 237 NLRB 1370, 1379 (1978), enf'd, 631 F.2d 944 (D.C.Cir.1980); *General Truck Drivers, Local 85,* 243 NLRB 665 (1979); *National Association of Broadcast Employees and Technicians (Osprey Productions, Inc.),* 226 NLRB 641, 644 (1976).

**29.** In some of these cases, there was evidence that the union knew or should have known that the primary employer was not even present at the picketed job site. See, *e.g., National Association of Broadcast Employees and Technicians, Local 31,* 237 NLRB 1370, 1379 (1978).

**30.** Even in common situs picketing cases, however, the standard is not applied mechanically. See *Local 501, International Brotherhood of Electrical Workers, AFL–CIO v. NLRB, supra.*

**31.** That contact, moreover, as noted above, was initiated by Nolan itself.

**32.** The Board seeks to justify its new rationale on the following bases: First, it maintains that if it did not require the union to prove deception or inaccessibility of information concerning the employer's neutrality, the defense of lack of knowledge would be too conveniently raised and too readily taken advantage of. Second, it argues that unlike the proof needed to show a union's subjective intent, the facts required to establish that a union made a good faith, but unsuccessful effort to determine whether an employer was primary or neutral are capable of objective proof. Finally, it argues that since the union is in the best position to establish the nature of its inquiry, it is not unduly onerous to place the burden on the union to adduce such evidence. Supplemental Decision and Order at 14, J.A. at 17a.

party,[33] and he is therefore a logical candidate upon whom to impose the burden of imparting information. Moreover, that burden is minimal.

By contrast, it would be very onerous and it would also substantially infringe on the rights of employees to engage in concerted activity protected by the Act if, before they could exert legitimate [34] pressure on their employer, they were required to conduct an investigation into whether that employer might, on some basis, have a contractual relationship with a neutral party whose interests would be affected by that pressure. Both section 8(b) and the labor laws generally [35] have as their purpose not only the prevention of secondary boycotts; they also protect the rights of labor organizations to place pressure on employers with whom they have a primary dispute. *Edward J. DeBartolo Corp. v. NLRB*, 463 U.S. 147, 103 S.Ct. 2926, 79 L.Ed.2d 535 (1983); *International Longshoremen's Association, AFL–CIO v. Allied International, Inc.*, 456 U.S. 212, 223 n. 20, 102 S.Ct. 1656, 1663 n. 20, 72 L.Ed.2d 21 (1982); *NLRB v. Local 825, International Union of Operating Engineers, AFL–CIO*, 400 U.S. 297, 302, 91 S.Ct. 402, 406, 27 L.Ed.2d 398 (1971). As the Supreme Court phrased it in the *Denver Building and Construction Trades Council* case, *supra,* the secondary boycott rules were designed to implement the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressure in controversies not their own."

341 U.S. at 692, 71 S.Ct. at 953. By shifting the burden to the union, the board entirely ignores and, in fact, jeopardizes the other, non-secondary boycott purposes of the labor laws.

## V

For these reasons, we hold that the Supplemental Decision and Order of the Board cannot be sustained on the basis of its new rationale.

Upon remand, the Board must either explicitly find that Local 829 had a forbidden secondary object or it must dismiss the proceeding.[36] In order to find that the union had a secondary object, the Board must have before it new, credible evidence to support its inference that the union knew that TTI possessed absolute contractual control over the disputed work. Absent such evidence, the Board may not find a violation of section 8(b)(4)(ii)(B). The decision of the Board is reversed and remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

---

**33.** If after having been so informed, the union nevertheless begins or continues its coercive activities, the burden could fairly shift to it to explain why it should not be held to have violated the secondary boycott provisions of the statute.

**34.** The employees, as in this case, might believe that the employer breached a work preservation clause in the collective bargaining agreement.

**35.** Section 8(b)(4)(ii)(B) specifically provides that "nothing contained in this clause (B) shall be construed to make unlawful, where not oth-

erwise unlawful, any primary strike or primary picketing." Congress plainly did not intend for the secondary boycott provision to infringe upon the rights of employees to engage in collective bargaining, their right to engage in the other concerted activities guaranteed by section 7, and their right to strike protected by section 13.

**36.** As indicated in note 14, supra, we intimate no position on several other issues raised by the parties.