**TAYLOR MILK COMPANY, a Pennsylvania Corporation, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL—CIO, an Unincorporated Association and Labor Organization, International Brotherhood of Teamsters, Dairy Conference—USA and Canada, an Unincorporated Association and Labor Organization, Defendants.**

No. Civ.A. 95–1663.

United States District Court, W.D. Pennsylvania.

Dec. 5, 1997.

882

John A. McCreary, Jr., Charles R. Volk, Volk, Hellerstedt & Connolly, Pittsburgh, PA, for Plaintiff.

Joseph J. Pass, Ernest B. Orsatti, Jubelirer, Pass & Intrieri, Pittsburgh, PA, Mary T. Connelly, Intern. Broth. of Teamsters, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

### D. BROOKS SMITH, District Judge.

Taylor Milk Company ("Taylor") has sued the International Brotherhood of Teamsters and its Dairy Conference (collectively the "IBT" or "Teamsters"), alleging that the IBT engaged in prohibited secondary activity in violation of § 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4), and seeking damages under § 303 of the Labor–Management Relations Act, 29 U.S.C. § 187. Before the court is defendants' motion for summary judgment, dkt. no. 13. Upon review of the record, I find that there exists a genuine issue of material fact which requires that I deny the motion.

## I.

This litigation centers around Taylor's failed attempt to purchase a dairy plant from Borden, Inc., in 1995.[1] Borden was in the process of selling or closing all of its dairy operations in the Eastern United States, including a plant in Youngstown, Ohio. Taylor, for its part, was faced with a major capacity shortage at its plant in Ambridge, Pennsylvania, a short distance from Pittsburgh. Borden's Youngstown workers were represented by IBT Local 377, while Taylor's Ambridge employees were represented by Local 205. It appears that the labor costs under the Local 377 agreement were significantly less than those under Local 205's contract; indeed, Taylor planned to eliminate many of the jobs in Ambridge after it acquired the Youngstown facility.

Taylor and Borden entered into a binding agreement to negotiate exclusively with one another for the sale and purchase of the Youngstown plant on August 8, 1995, with Taylor paying a $50,000 nonrefundable deposit to Borden to guarantee that exclusivity. Taylor's bank financing for the deal, however, was contingent upon the existence of stable, long-term collective bargaining agreements which Taylor could assume.

On August 24, Mr. Joseph Taylor and Taylor's labor counsel, Attorney Charles Volk, met with representatives of Local 377 and proposed a new contract with moderate increases in wages and benefits; Local 377 indicated a willingness to negotiate further. The next day, Messrs. Taylor and Volk met with representatives of Borden and Local 205. Local 205 was represented by its principal officer, Mr. William Lickert. In addition, Mr. Fred Gegare, Chairman of the Teamsters Dairy Conference, was present at the meeting. Unfortunately for Taylor, things quickly turned sour.

Local 205 believed that it had the right to "follow its work" to the new Youngstown facility, relying on a no-subcontracting clause in its collective bargaining agreement with Taylor. After Taylor. After Taylor made its proposal, Gegare spoke up and told Borden representatives that they should sell the Youngstown plant to someone other than Taylor, Volk dep. at 46; Taylor dep. at 94, 135, and that he would not accept a "substandard contract" for that facility, Volk dep. at 32. Gegare also stated that he was "invoking" Article 12, section 2 of the IBT constitution and awarding jurisdiction of the plant to Local 205, in place of Local 377. Volk dep. at 32, Taylor Dep. at 110, 112. Accordingly, he continued, Local 377 would not be negotiating any new contract for the Youngstown facility; the new contract, if any, would be negotiated solely by Gegare and Lickert. Volk dep. at 32. Shortly after that, the meeting broke up with no resolution of the labor issues.

On September 1, Borden attempted to negotiate a long-term contract with Local 377 so that Taylor could buy the plant. Local 377's business agent, Mr. Eben Byers, however, told Borden that Gegare had given him explicit instructions not to negotiate, but to bring any proposal directly to Gegare. A month later, on October 2, Borden representatives visited Byers and Gegare in Milwaukee, where Gegare was based. Byers and Local 377 were excluded from the negotiations entirely. Byers dep. at 32–33. Gegare then presented a proposal to Borden, *id.* at 33, which Borden rejected. At the conclusion of the meeting, Gegare told Byers that Gegare's offer was presented as Local 377's proposal, that Borden had rejected it, that there would be no further negotiations, and that the plant would close. Byers thought that Gegare's offer was unrealistic and asked for too much. *Id.* at 33–34.

Borden subsequently sold the Youngstown plant to Dean Foods, which used its customer list and ceased production operations. Taylor then filed this suit.

## II.

Summary judgment shall be "rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

1. For purposes of this memorandum, I examine the facts in a light most favorable to Taylor, the nonmoving party.

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Accordingly, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "[S]ince a complete failure of proof concerning an essential element," *id.* at 323–24, 106 S.Ct. at 2554, on which a party bears the burden of proof at trial establishes that the moving party is "entitled to a judgment as a matter of law," the nonmoving party must establish the existence of every element essential to his case. *Id.*

Once the moving party has satisfied its burden, the nonmoving party is required by Federal Rule of Civil Procedure 56(e) to go beyond the pleadings by way of affidavits or other admissible evidentiary material to establish that there is a genuine issue of material fact for trial. *Clark v. Clabaugh,* 20 F.3d 1290, 1294 (3d Cir.1994). That is, the nonmoving party "may not rest upon mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (citing Fed. R.Civ.P. 56(e)).

A fact is "material" if it "might affect the outcome of the suit under the governing law...." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 257, 106 S.Ct. at 2510, 2514–15.

In determining whether a nonmovant has established the existence of a genuine issue of material fact requiring a jury trial, the evidence of the nonmovant must "be believed and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. Whether an inference is justifiable, however, depends on the evidence adduced. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 595–96, 106 S.Ct. 1348, 1360–61, 89 L.Ed.2d 538 (1986). An inference based upon speculation or conjecture, however, does not create a material factual dispute sufficient to defeat summary judgment. *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n. 12 (3d Cir.1990). "[S]imply show[ing] that there is some metaphysical doubt as to the material facts" does not establish a genuine issue for trial. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356.

## III.

Section 8(b)(4)(ii) of the NLRA makes it an unfair labor practice to:

> threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
>
> (B) forcing or requiring any person ... to cease doing business with any other person....
>
> (C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees....

29 U.S.C. § 158(b)(4)(ii). As the Third Circuit has stated it:

> Section 8(b)(4)(ii) of the NLRA prohibiting secondary boycotts by unions essentially prohibits union conduct designed to force a primary employer (the employer with which the union has a dispute) to bargain with a union or to force a neutral employer (an employer with which the union has no dispute) to cease doing business with the primary employer. The proscribed methods used to achieve the objectives include threatening, coercing, or restraining the secondary employer. Coercion can include economic pressure upon the neutral party. The purpose of the prohibition against secondary boycotts is to shield unoffending employers from pressures in disputes not their own, though preserving the rights of unions to bring pressure to bear on offending employers in primary labor disputes.

*Limbach v. Sheet Metal Workers Int'l Ass'n,* 949 F.2d 1241, 1249–50 (3d Cir.1991) (in banc).

Not all union conduct directed at a secondary employer will violate the Act. A union remains free to "persuade, induce or encourage" the secondary employer; only when the conduct becomes coercive is a violation made out. *See BE&K Constr. Co. v. United Bhd. of Carpenters,* 90 F.3d 1318, 1330 (8th Cir.1996); *accord Brown & Root, Inc. v. Louisiana State AFL—CIO,* 10 F.3d 316, 320 (5th Cir.1994). Coercion "means no more than non-judicial acts of a compelling or restraining nature, applied by way of concerted self help consisting of a strike, picketing or other economic retaliation or pressure of a compelling or restraining nature...." *Brown & Root,* 10 F.3d at 320; *accord Limbach,* 949 F.2d at 1256. It is not necessary that the conduct itself be unlawful. *Limbach,* 949 F.2d at 1255. An objective test is applied to such conduct: "the specific language and the surrounding facts and circumstances are examined, not the subjective interpretation of the listener." *BE&K,* 90 F.3d at 1331.

In addition, for a violation to be found, the union must be pursuing a "secondary" objective against a neutral party, not merely attempting to enforce its primary rights against its contracting partner. *See United Scenic Artists, Local 829 v. NLRB,* 655 F.2d 1267, 1269–70 (D.C.Cir.1981). "The evaluation of activity as primary or secondary depends on whether the activity was addressed to the labor relations of the contracting employer vis-a-vis his own employees, or whether the activity was tactically calculated to satisfy union objectives elsewhere." *Id.* It is not necessary, however, for the secondary objective to be the union's sole purpose; liability may attach for secondary boycotts even if the union has some legitimate purposes as well. *Iodice v. Calabrese,* 512 F.2d 383, 389 (2d Cir.1975).

Evaluating a § 8(b)(4)(ii) claim thus involves a two-part test, both parts of which must be satisfied: (1) whether the union's conduct was coercive; and (2) whether an object was to secondarily force a neutral person to cease doing business with another. *Brown & Root,* 10 F.3d at 320. I turn now to the application of that test to the facts of this case.

IV.

A.

The gravamen of plaintiff's claim is that the union unlawfully coerced a neutral party, Borden, to cease doing business with Taylor, not because of any primary dispute between Borden and the IBT, but because of a secondary dispute between the IBT and Taylor. To accomplish this, plaintiff alleges that the IBT sabotaged the Borden–Taylor negotiations by taking them over and conducting them in a manner calculated to doom any new collective bargaining agreement.

Defendants, in their opening brief, appear to deny that mere coercion is sufficient to trigger violation of § 8(b)(4)(ii), but instead argue that the plaintiff must demonstrate the independently unlawful nature of the union's activity, as well as its improper motive. This is incorrect. An activity, though perfectly lawful in and of itself, can violate § 8(b)(4)(ii) if it is done for an unlawful purpose, so long as the activity is coercive rather than merely persuasive. *Limbach,* 949 F.2d at 1255. Indeed, in *Limbach,* the Third Circuit held that the union's repudiation of a pre-hire agreement, lawful in itself because the agreement had expired, was sufficient to violate the NLRA because the repudiation was done to coerce the employer from ceasing its "double breasted" form of organization. *Id.* at 1250.

Defendants assert that Gegare's statement that Borden should sell its plant to someone other than Taylor was not coercive, but "can only be considered an entirely lawful inducement or suggestion." Defendants' brief at 7. Standing alone, this statement does not, in fact, appear to be coercive in nature. Nevertheless, as defendant acknowledges, I must examine Gegare's remarks in light of the surrounding facts and circumstances. Under such an analysis, a rational trier of fact could well find defendants' conduct coercive because Gegare credibly threatened to frustrate the negotiations between Borden and Local 377, and ultimately between Borden and Taylor.

Gegare's "suggestion" was soon backed up by his expression of intent to invoke Article 12 of the IBT constitution and award the work to Local 205. This threat may well have been taken seriously by both Local 377 and Borden management,[2] even though a careful examination of the constitution reveals that Article 12 provides scant support for Gegare's invocation of it. Gegare's instruction to Byers not to negotiate was obeyed, and Borden ended up traveling to Milwaukee to negotiate directly with Gegare.[3] Byers and Local 377 were then excluded from the table and the negotiators considered a proposal prepared by Gegare and later characterized by Byers as unrealistic. This course of conduct allegedly attained its coercive goal when Borden rejected Gegare's proposal and any hope of obtaining a binding collective bargaining agreement for a new owner disappeared.

In short, there is evidence that Gegare asserted his authority as Chairman of the Teamsters Dairy Conference to restrain Borden and Local 377 from pursuing their usual course of negotiations. This assertion of authority, based on Article 12 of the IBT Constitution, was taken even though the union had never invoked Article 12 under similar circumstances and the International had not previously involved itself directly in Local 377's negotiations. Contrary to defendants' assertion that the circumstances of Gegare's "suggestion" demonstrated its non-coercive nature, Gegare's dubious constitutional support for his unprecedented invocation of Article 12 could instead support an inference that his true purpose was unlawful coercion.

This record compels the finding that there is sufficient evidence from which a reasonable factfinder could determine that the defendants' actions were coercive, not merely persuasive. In an attempt to negate such a conclusion, defendants assert that it is normal for tempers to sometimes flare during labor-management negotiations, particularly when, as here, management proposes a plan that will result in significant job losses. Such reactions, they maintain, are not *per se* coercive, especially in light of the parties' alleged knowledge that Gegare had no authority to award the work to Local 205 and that everyone simply ignored him. Taylor has adduced evidence, however, that Gegare's actions were accorded deference by both Borden and Local 377 and that the principals followed the course of negotiations which he established, even though Gegare knew he lacked authority under the IBT constitution for his position.[4] Accordingly, I conclude that the question of whether Gegare's statement was intentionally coercive *vel non* cannot be determined on summary judgment.[5]

I now turn to the lawfulness of the defendants' purpose or objective.

B.

■ Defendants maintain that the undisputed facts show that the IBT had no unlawful objective. Specifically, they claim that this was a legitimate primary dispute, not a prohibited secondary one. According to defendants, "[t]he work in the Taylor dispute was traditionally the work of defendant Local 205[, and] Gegare ... was indisputably not attempting to force either plaintiff or Borden

2. This is particularly true in light of the fact that Borden, which owned many unionized dairy plants, had dealt with Gegare in the past and faced the possibility of dealing with him in future negotiations. This arguably gave Gegare leverage over Borden.

3. Defendants also argue that "Gegare's statement was not accompanied or followed by any threatening or coercive conduct[,]" brief at 8, based on the fact that negotiations between Borden and Local 377 did, in fact, continue after the statement was made. Sham negotiations, however, are hardly unknown in the collective bargaining process. Whether that bargaining was held in good faith, or, as plaintiff asserts, were intention-

ally doomed to failure from the beginning, presents a disputed factual issue.

4. The IBT has admitted in deposition testimony and in its answers to interrogatories that the prerequisites to the implementation of Article 12 were not met, Gegare dep. at 12, dkt. no. 19, exh. 6, despite Gegare's comments and correspondence to the effect that he *was* implementing it, dkt. no. 19, exh. 4.

5. Even if I were to analyze the statement in isolation, I would still be required to apply an objective standard, *see BE&K*, 90 F.3d at 1331, which would render the parties' alleged, subjective reactions irrelevant. *Id.*

to assign work to Local 205 that it has not done in the past." Brief at 11. Rather, their "objective was to ensure that Local 377 did not negotiate a substandard contract and to enforce a colorable contract right and preserve Local 205's work." *Id.*

I agree that the IBT had a colorable *concern* about work traditionally performed by Local 205 being sent to a different local with an allegedly inferior contract. That concern, however, related only to Taylor, the secondary party, not to Borden. At the times material to this action, Borden still owned the Youngstown plant and still was the employer of the Local 377 workers, who, I must note, traditionally performed *that* work. Moreover, Borden's proposed contract with Local 377 was superior, from an employee standpoint, to the existing contract. That being the case, I am unable to conclude that defendants' actions—which resulted in the loss of all the Youngstown jobs—were taken in furtherance of legitimate labor issues between Borden and its union. Rather, it may be that their true objective "was tactically calculated to satisfy union objectives elsewhere[,]" *United Scenic Artists,* 655 F.2d at 1270, specifically Taylor's dairy plant in Ambridge.

In addition, the mere fact that a concern may be legitimate does not justify any and all conduct taken to pursue and satisfy it. If Local 205 believed that the pending Borden-Taylor sale jeopardized its members' rights, it had other, lawful options for seeking redress. It could have filed a grievance under its existing collective bargaining agreement and alleged that Borden's transfer of the work violated the letter or spirit of the "no-subcontracting" clause. Indeed, the union had a history of successfully grieving that very provision in the Taylor contract. Alternatively, after the sale was consummated, it could have had the jurisdictional dispute between locals resolved by the NLRB in a § 10(k) proceeding. *See, e.g., International Longshoremen's Union, Local 14 v. NLRB,* 85 F.3d 646 (D.C.Cir.1996). Instead, the IBT embarked upon an unprecedented and admittedly unjustified invocation of Article 12 as the rationale for its actions, a choice of tactics which a finder of fact might consider telling. An actor who uses illegitimate means as a pretext to obtain its desired objective may be inferred to have no legitimate means at its disposal, and thus no legitimate goal.

I cannot conclude, at the summary judgment stage, that defendants' purpose or objective was lawful.

### C.

Defendants also seek summary judgment on the ground that there is no evidence that their conduct caused Taylor's damages. They first argue that because Taylor's deposit was non-refundable in any event, the union could not have been responsible for its loss. I disagree. It is true, of course, that the union was not the "but-for" cause of the expenditure of the funds used to pay the deposit. Nevertheless, those funds would never have been spent without some substantial hope of consummating the purchase of Borden's Youngstown plant and operating it at a profit. If plaintiff's version of the facts is correct, defendants' conduct spoiled that hope and turned what would have been a likely profit into a certain loss. This argument is therefore both incorrect and disingenuous.

Defendants also attack plaintiff's claim for the loss of the benefit of its bargain as too speculative to support recovery. They assert that there is no evidence of any causal connection between the defendants' conduct and Borden's decision to sell the plant to Dean Foods. Again, I disagree. Successful corporations do not waste time and resources negotiating complex asset sales that they have no intention of consummating. A rational trier of fact could legitimately infer that, where two parties agree to exclusive negotiations and seriously attempt to put together a sale, and a third party acts in ways calculated to sabotage the deal, the failure to consummate the sale was the result of the third party's misconduct.

### V.

I will therefore deny defendants' motion for summary judgment. An appropriate order follows.

### *ORDER*

AND NOW, this 26th day of November 1997, upon consideration of defendants' motion for summary judgment (dkt. no. 13) and the arguments relative thereto, it is hereby

ORDERED and DIRECTED that:

1. The motion for summary judgment is DENIED.

2. Counsel shall appear in my Pittsburgh chambers on Friday, December 12, 1997, at 10:00 am for a pretrial conference.