_____

Nos. 95-1886 and 95-1944
_____

BE&K Construction Co.,                  *
                                        *
      Plaintiff - Appellee,             *
                                        *
      v.                                *   Appeal from the United States
                                        *   District Court for the
United Brotherhood of                   *   Eastern District of Arkansas
Carpenters and Joiners of               *
America, AFL-CIO; United                *
Paperworkers International              *
Union, AFL-CIO,                         *
                                        *
      Defendants - Appellants.          *
                         _____

            Submitted:    January 10, 1996

               Filed:   July 18, 1996
                         _____

Before WOLLMAN, CAMPBELL,[*] and MURPHY, Circuit Judges.
                         _____


MURPHY, Circuit Judge.


      This case involves claims brought by BE&K Construction Company (BE&K)
against the United Paperworkers International Union (Paperworkers) and the
United Brotherhood of Carpenters and Joiners of America (Carpenters).  BE&K
alleged that the unions had violated federal labor law and tortiously
interfered with its contractual relations under Arkansas law.  After a jury
awarded BE&K $20,000,000 in punitive damages and $125,000 in compensatory
damages, the district court denied motions for judgment as a matter of law,
for a new trial, and for remittitur.  The unions appeal

_____

      *The HONORABLE LEVIN H. CAMPBELL, United States Circuit
      Judge for the First Circuit, sitting by designation.

from the order denying their post-trial motions and from the final judgment.  We reverse and remand.

## I.

BE&K is a non-union merit shop construction contractor headquartered in Birmingham, Alabama.  It performs in-plant and construction work for various industries throughout the country.  BE&K was hired by Potlatch Corporation as the general contractor on a construction project scheduled to begin in February 1992 at the Potlatch Cypress Bend mill in McGehee, Arkansas.  Potlatch is a paper manufacturing company headquartered in San Francisco, California that operates a number of mills in northern Idaho, northern Minnesota, and southern Arkansas.

In early 1991 the Cypress Bend mill solicited bids for installation of a piece of equipment called a top former, or Bel Bond.  Four bids were received, including BE&K's bid of $582,000.[1]  George Hight, the Potlatch Project Engineer responsible for selecting a contractor for the Bel Bond project, contacted a BE&K manager on October 10, 1991 and informed him that Potlatch had decided to award the project to BE&K.  BE&K began preparations for the project.

Potlatch employees at the Cypress Bend paper mill are represented by two local Paperworkers unions, a maintenance local and a production local.[2] The Paperworkers are an international union that represents in-plant production and maintenance workers at paper mills throughout the United States.  The evidence at trial indicated that the local unions and the company maintain a

---

[1]The bid amount was later reduced to approximately $575,000.

[2]The local unions were originally named as defendants in this action, but prior to trial BE&K voluntarily dismissed with prejudice its claims against them.

2

cooperative relationship. Potlatch management meets regularly with representatives of the local unions and the Paperworkers to discuss issues of mutual interest concerning the operation of the Cypress Bend plant.

One such mutual interest meeting took place at the Cypress Bend plant on October 24, 1991, soon after Potlatch had hired BE&K for the Bel Bond construction project. The meeting was attended by thirteen Potlatch officials, including John Richards, the president and chief operating officer who was based in San Francisco but was in Arkansas to attend meetings, George William Morton, the Cypress Bend plant manager, and Beverly Burchfield, the Cypress Bend employee relations manager; ten local union officials, including Paperworkers Local 1532 President Bob Barber; and two international Paperworkers representatives, Joe Bradshaw and Tommy McFalls. The meeting lasted approximately two hours and covered a variety of topics.

At the meeting on October 24, Anna Haney, a Potlatch production superintendent, made a short presentation about the status of various projects in her division and mentioned that BE&K had been awarded a contract on the Bel Bond project. After her presentation, Tommy McFalls, Joe Bradshaw and Bob Barber made brief comments expressing their concern about the decision to hire BE&K and asked the company to reconsider. All three stated that they did not want anything to interfere with the good relationship Potlatch had with the local unions and said that hiring BE&K could lead to problems. They mentioned that BE&K's involvement in the project would likely attract the attention of the Carpenters. The Carpenters are a separate international union that represents workers in various trades and crafts, including carpenters and millwrights who build, renovate, and maintain industrial plants and machinery. They had organized a national publicity campaign to expose disputed labor practices of BE&K and other non-union construction contractors. McFalls explained that the Carpenters

3

might picket and handbill at the site and that it was possible the unionized employees at Potlatch might join in. All the testimony from those present at the meeting, including the union representatives and the Potlatch officers, described the comments as bland and nonthreatening. No member of the Carpenters was present at the meeting.

Potlatch president Richards later testified that he had not been aware that BE&K had been hired for the Bel Bond project until it was disclosed at the meeting. When he heard that Potlatch had contracted with BE&K, he was surprised. He knew that BE&K had a reputation as a confrontational non-union company. He had also read about a riot that had occurred two years earlier in International Falls, Minnesota after a company had hired BE&K as construction manager for a major expansion project.[3] He feared that hiring BE&K could cause his company grief. He was surprised that the reaction of the union representatives was so low key and bland. When they suggested in their remarks that there could be problems, he again thought about the incident at International Falls. There was no evidence that that incident came to mind for any of the other twelve Potlatch officials in attendance or any of the union officials.

After the meeting, Richards told Morton that he was disturbed that BE&K was involved in the construction project. He was concerned that it might interfere with the good relationship between the company and the local unions and present possible problems similar to those at International Falls. He asked Morton to review the situation and attempt to get out of the contract. Richards later called Dick Congrieve, Morton's boss, and asked him to follow through on the situation. After calculating the costs

---

[3]Richards had read articles from Minnesota papers about the International Falls riot which had been supplied by a clipping service.

involved, Morton terminated the contract with BE&K[4] and hired Boyed Sanders Construction Co., a union contractor, to do the job.

On October 28, a Potlatch official informed Bob Barber, the president of one of the local unions, that the contract with BE&K had been terminated, but that it would be better if that fact were not advertised. In April 1992, The Paperworker, the international union's magazine, published a report on a campaign to oust BE&K and other non-union contractors from paper mills and plants. It included the statement that "[e]fforts by Paperworkers Region Seven prevented BE&K from starting already-scheduled work at Potlatch's McGehee, Ark., mill." (Carpenters Appendix at 345).

There was no evidence that the Carpenters were involved in the October 24 meeting or that they even knew about it at the time or knew that Potlatch had hired BE&K, but there was evidence they were involved in a national publicity campaign directed at disputed labor practices of BE&K and other non-union contractors. In that campaign they sought and obtained substantial cooperation from the Paperworkers. The campaign involved the distribution of leaflets, informational picketing, publicity, speeches, presentations, and communications urging companies not to award contracts to BE&K. Neither party disputes that these activities are protected under federal law. The campaign raised issues concerning employee wages and benefits, job related safety, and the use of non-local workers on its projects. BE&K admits that it has a reputation as a company that is confrontational about union issues and has regularly worked in place of striking union members.

Edward J. Durkin, a leader of the Carpenters publicity

---

[4]After the termination, Potlatch sent BE&K a check for $35,400. This represented payment for costs that BE&K claimed to have incurred on the project. Potlatch requested further information about additional claimed expenses, but BE&K never responded nor attempted to collect any additional payment.

campaign, learned after the fact that Potlatch had terminated its contract with BE&K. On November 8, 1991 he described the termination in a letter he sent to Carpenters agents involved in the campaign:

> The president of the [Paperworkers], Wayne Glenn, reported last week to the [Carpenters] general president that Potlatch Corporation cancelled a construction project with BE&K at McGee [sic], Arkansas, just two weeks after it began to man the job. Paperworkers Vice-President Joe Bradshaw forcefully presented to Potlatch's CEO the union's concerns about the presence of BE&K at the mill. Within several days of the discussion, BE&K's 200 men were off the site [and] all evidence of BE&K was gone. . . . Solidarity works.

(Carpenters Appendix at 165).

After the Bel Bond contract was terminated, BE&K brought this action against the Carpenters and Paperworkers. It claimed that the unions had engaged in unlawful secondary boycott activity in violation of § 303(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 187(a), by using threats and coercion to force Potlatch to cease doing business with BE&K. It also asserted that the unions had tortiously interfered with its contractual relationship or business expectancy under Arkansas law.

Both the federal and state claims were based on the statements made by Paperworkers McFalls, Barber, and Bradshaw at the October 24, 1991 mutual interest meeting with Potlatch officials. BE&K alleged that those comments amounted to threats of violence or other unlawful union conduct that had caused Potlatch to terminate its contract with BE&K, and asserted that the Paperworkers representatives were speaking as agents of the Carpenters.

The case was tried to a jury during four days in April 1994. To support its claims that the unions had threatened Potlatch, BE&K

6

presented evidence describing what was said at the October 24 mutual interest meeting. This included excerpts from a deposition given by Richards, testimony from Beverly Burchfield who had prepared the meeting agenda and minutes, and deposition testimony from Morton who had also been present at the meeting. In addition, there was testimony describing the project, the bidding, the oral acceptance, the termination of the contract, and damages. Ted Kennedy, the chairman and CEO of BE&K, talked about the BE&K project at International Falls, and excerpts were read from Edward Durkin's deposition describing the Carpenters publicity campaign.

Over strong objections from the unions, BE&K was allowed to show a videotape of a 1989 riot at a BE&K construction workcamp in International Falls, Minnesota. The seventeen minute video was recorded by three cameramen hired by BE&K and featured some descriptive commentary by an unnamed narrator. It showed a large crowd gathering outside the camp gate, the gate being battered down, groups of men milling around the camp, and cars and trailers being overturned and burned. The unions argued that the videotape was irrelevant and prejudicial because neither the Carpenters nor the Paperworkers had any connection to the events that it depicted.[5] BE&K stated it was offered to show what Richards had in mind when he thought about the International Falls incident during the October 24 meeting.

After BE&K presented its evidence, the unions jointly moved for dismissal of its claims as a matter of law under Fed. R. Civ. P. 50(a). The district court denied the motion as to the federal claim and took it under advisement as to the state claim. The

---

[5]They also argued that the tape was inadmissible because BE&K had not produced it during discovery.

7

unions presented their case,[6] and no rebuttal evidence was offered by BE&K. The Rule 50 motion was not renewed at the end of all the evidence.

The jury found in favor of BE&K on both the federal and state claims. It found the unions jointly and severally liable for $125,000 in compensatory damages, without assigning those damages to either the federal or state claims. The jury also found each union separately liable for $10,000,000 in punitive damages on the state law claim.

After trial, the unions filed a joint motion for judgment as a matter of law, or in the alternative, for a new trial or remittitur. After a hearing on the motion, the district court denied it on the merits. BE&K did not argue that the unions had waived their right to seek judgment as a matter of law by failing to renew their Rule 50 motion at the close of all the evidence, and the district court did not address the issue.

## II.

The arguments on appeal are not identical for the individual appellants. The Carpenters argue that they are entitled to judgment as a matter of law because the evidence does not support any claim against them. There is no evidence of their participation in the October 24 meeting where the alleged threats were made, and there is insufficient evidence to support any theory that the Paperworkers were acting as their agents. Both unions argue that judgment as a matter of law should have been granted on

---

[6]The unions called four witnesses at this point: Potlatch President Richards, Plant Manager Morton, and union representatives McFalls and Barber. Richards and Morton had already testified by way of deposition as part of BE&K's case so only McFalls and Barker were completely new witnesses. (Project Engineer Hight had been called before the close of BE&K's case in order to accommodate his schedule.)

the state claim because of preemption and on the federal claim because of insufficient evidence.  They argue in the alternative that a new trial should be granted because the district court erred in admitting the riot videotape and in instructing the jury on punitive damages.  Finally, the unions argue for substantial remittitur of the punitive damages award because it is grossly out of proportion to the legal wrong alleged.

BE&K responds that the unions waived their claims for judgment as a matter of law by failing to renew their Rule 50 motion at the close of evidence.  It also contends that there is sufficient evidence in the record from which the jury could reasonably infer an agency relationship and which supports the verdict on both the federal and state claims.

A.

BE&K argues that both unions waived any right to judgment as a matter of law because they failed to renew their Rule 50 motion at the close of the case.  Rule 50(b) provides for the renewal of a motion for judgment after trial when it has been made at the end of all the evidence.[7]  The unions jointly moved for judgment at the close of the plaintiff's case, and then again after trial.  During trial the court denied the unions' motion as to the federal claim, but deferred ruling on the portion dealing with the state claim.

---

[7]Rule 50(b) provides:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment -- and may alternatively request a new trial or join a motion for a new trial under Rule 59.

9

Not much new evidence was submitted after the motion was made. The additional testimony was completed in less than a day, and BE&K offered no rebuttal evidence.

If a party does not move for judgment as a matter of law at the close of all the evidence, it normally cannot later argue that there was insufficient evidence to support the verdict. Pulla v. Amoco Oil Co., 72 F.3d 648, 655 (8th Cir. 1995). There are at least two recognized exceptions, however. The first is where a Rule 50 motion is made shortly before the close of the evidence and the court indicates in some way that it need not be renewed in order to preserve the right to challenge the verdict. Id.; Halsell v. Kimberly-Clark Corp., 683 F.2d 285, 294 (8th Cir. 1982), cert. denied, 459 U.S. 1205 (1983); United States v. 353 Cases * * * Mountain Valley Mineral Water, 247 F.2d 473, 477 (8th Cir. 1957). The second is where not allowing such claims would constitute plain error resulting in a manifest miscarriage of justice. Pulla, 72 F.3d at 655; Jones v. St. Clair 804 F.2d 478, 479-80 (8th Cir. 1986); 353 Cases, 247 F.2d at 477 (court may review errors that are "obvious" or that "seriously effect the fairness and integrity of the judicial proceedings").

A variation of the standard exception has been recognized when 1) the district court defers ruling on the motion, 2) no evidence related to the claim comes in after the motion, and 3) very little time passes between the motion and the close of the evidence. See Purcell v. Sequin State Bank & Trust Co., 999 F.2d 950, 956 (5th Cir. 1993); Boynton v. TRW, Inc., 858 F.2d 1178, 1186 (6th Cir. 1988) (en banc); see also Myers v. Norfolk Livestock Market, Inc., 696 F.2d 555, 558 (8th Cir. 1982).

BE&K raises waiver for the first time on appeal, claiming the unions waived their rights to argue insufficiency of the evidence when they failed to renew their motion at the close of evidence. BE&K did not raise any Rule 50 objection to the unions' post-trial

10

motion, however, either in writing or at the hearing on it.  The district court was therefore not asked to consider waiver and it ruled on the merits.  If BE&K had raised waiver before the district court, that court would have had the opportunity to consider all the relevant circumstances.

Both sides missed a procedural step, and it is appropriate to reach the merits under all the circumstances.  An exception to the Rule 50 requirement of renewal at the close of the evidence is  basically made out here.  Only a short time elapsed between the unions' motion and the close of all the evidence, only two witnesses were called who had not already testified, no additional evidence was put in by BE&K, and the trial judge deferred ruling on part of the motion.

B.

The Carpenters claim that they are entitled to judgment as a matter of law because there is no evidence to show that they were involved in the events leading to the termination of BE&K's contract.  Judgment as a matter of law is appropriate only if the evidence on the record is susceptible of no reasonable inference sustaining BE&K's position.  Kaplon v. Howmedica, Inc., 83 F.3d 263, 266 (8th Cir. 1996); Smith v. World Ins. Co., 38 F.3d 1456, 1460 (8th Cir. 1994).  All conflicts must be resolved in BE&K's favor and the court will not engage in a weighing or evaluation of the evidence or consider questions of credibility.  Kaplon, 83 F.3d at 266.  A motion for judgment as a matter of law presents a legal question, and its denial is reviewed de novo.  Id.

It is undisputed that the Carpenters and the Paperworkers are completely separate entities and that no member of the Carpenters was present at the October 24 meeting when the alleged threats were made. There is no evidence that either the Paperworkers or the Carpenters had advance knowledge of what would be announced or

11

discussed at the meeting and no evidence that the Carpenters had any contact with the Paperworkers regarding the BE&K contract until after it had been terminated.

BE&K's claims against the Carpenters rely on an agency theory.  It argues that the cooperation of the Paperworkers with the Carpenters' national publicity campaign forged an agency relationship between the two unions and that the individual Paperworkers representatives who spoke at the October 24 mutual interest meeting did so as agents of the Carpenters.

The legal standards governing agency are not in dispute.  Agency requires "manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." Restatement (Second) of Agency § 1 cmt. b (1985).  An essential element of any agency claim is that the asserted principal has the right to control the actions of the asserted agent.  <u>General Building Contractor Ass'n v. Pennsylvania</u>, 458 U.S. 375 (1982);  <u>Pledger v. Troll Book Clubs</u>, 871 S.W.2d 389, 392 (Ark. 1994); Restatement (Second) of Agency § 14.  The parties agree that the jury was properly instructed as to the law of agency, but dispute whether the evidence was sufficient to support a finding that the Carpenters had the right to control the actions of the Paperworkers representatives at the mutual interest meeting.

To support its agency theory, BE&K relies on evidence describing the Carpenters' publicity campaign against BE&K.  That evidence showed that the publicity campaign was directed by the Special Programs Department of the Carpenters, which is based in Washington but has field representatives across the country.  A written manual described how representatives should conduct campaign activities and included a section on soliciting the assistance of Paperworkers representatives in locations where BE&K was working or bidding.  The evidence also indicated that the two

unions formed a national solidarity committee consisting of five or six representatives of each union and that that committee determined that the publicity campaign against BE&K was a top priority issue. In addition, the two unions jointly published various handbills and leaflets related to the BE&K campaign.

Even when all possible inferences from this evidence are drawn in favor of BE&K, it is insufficient to show that the Paperworker representatives at the Potlatch meeting were acting as agents of the Carpenters. The sort of cooperation in the spirit of labor solidarity undertaken in the campaign does not transform one union into the agent of another. See International Longshoremen's Ass'n v. National Labor Relations Board, 56 F.3d 205, 213 (D.C. Cir. 1995), cert. denied, 116 S. Ct. 1040 (1996). Moreover, the October 24 meeting was one of a regular series between Potlatch management and representatives of the Paperworkers unions to which its employees belonged. There was no evidence that any labor representatives knew in advance of the meeting that a contract had just been awarded to BE&K so there would have been no opportunity for the Paperworkers and the Carpenters to confer about it.

BE&K claims that statements and actions of the Paperworkers representatives at, and after, the October 24 meeting created an inference that they were acting under the Carpenters' control. BE&K points to two pieces of evidence in the attempt to support an inference of control by the Carpenters: 1) the fact that McFalls said at the meeting that the Carpenters might come to the mill to picket and handbill and unionized employees at the mill might get involved; and 2) the fact that Bradshaw later told a member of the Carpenters involved in the solidarity campaign that Potlatch terminated the contract with BE&K.

This evidence is insufficient to give rise to an inference of control. There was no evidence presented at trial to suggest that the Carpenters had prior or contemporaneous knowledge that BE&K had

13

been hired by Potlatch, that a mutual interest meeting was taking place, or that the Paperworkers representatives would make statements at the meeting. Nor was there evidence that the Paperworkers at the meeting thought they were speaking on behalf of the Carpenters or that the Carpenters attempted to direct their actions.

After a careful review of the trial record, we conclude that the Carpenters were entitled to judgment as a matter of law because there was not evidence to link them to the statements made at the October 24 meeting or to support an inference that the Paperworkers were acting as their agents during the discussion.[8] The Carpenters are therefore entitled to judgment as a matter of law and dismissal of the claims against them.

C.

The Paperworkers argue that they are entitled to judgment as a matter of law on BE&K's state law tort claim because it is preempted by federal labor law.[9] The state claim alleges that the Paperworkers tortiously interfered with BE&K's contractual relations with Potlatch by threatening union violence unless BE&K was removed from the project. BE&K acknowledges that state regulation of labor relations, including state tort remedies, is generally preempted, but argues that this case involves an exception that allows states to regulate violent conduct.

---

[8]The state claim would have required even more than normal proof of agency to succeed. The Norris-LaGuardia Act contains special proof requirements in order to impose state tort liability on a union for the acts of agents. 29 U.S.C. § 106. Since there was insufficient evidence of agency, it is not necessary to discuss the more stringent Norris-LaGuardia requirements.

[9]This argument, as well as others made by the Paperworkers, was raised by both unions, but since there was no evidence that the Carpenters were involved in the challenged statements, the only issues remaining relate to the Paperworkers.

Both the state and federal claims in this case are based on the union statements made at the October 24 meeting. The Paperworkers argue there is no evidence that the comments made at that meeting were meant to convey a threat of union violence. BE&K claims that the evidence related to the riot at International Falls suggests that the statements were an implicit warning of a similar riot.

Threats of violence in labor disputes may in some cases violate both state and federal law, but the standards for avoiding preemption of a state claim and making out a federal claim are different. A greater showing is required in order to apply state law. To avoid preemption of the state claim, there must be evidence that the statements involved "violence or imminent threats to the public order." United Mine Workers of America v. Gibbs, 383 U.S. 715, 721 (1966). In contrast, a federal claim for damages requires evidence of threatening or coercive statements with a prohibited purpose. See Ozark Interiors, Inc. v. Local 978 Carpenters, 957 F.2d 566, 568-69 (8th Cir. 1992).

As a general rule, federal labor law preempts similar or contradictory state laws. See Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, 377 U.S. 252, 259-61 (1964) (LMRA); San Diego Building Trades Council v. Garmon, 359 U.S. 236, 244 (1959) (National Labor Relations Act (NLRA)). Congress has crafted a comprehensive statutory framework that reflects its determination that a uniform law of labor relations serves an important federal interest. The federal system seeks "to provide an informed and coherent basis for stabilizing labor relations conflict" and to "equitably and delicately structur[e] the balance of power among competing forces so as to further the common good." Amalgamated Ass'n of Street, Electric Railway and Motor Coach Employees of America v. Lockridge, 403 U.S. 274, 286 (1971). Any state regulation, that conflicts with or frustrates the purpose of this federal policy must yield to it. Morton, 377 U.S. at 259-61. This

15

includes state tort claims brought against parties to labor disputes.

Section 303 of the LMRA regulates union secondary activities and strikes a balance between the interest of employers in prohibiting secondary interference and a union's interest in free expression and its right to engage in protected conduct. The statute makes it unlawful for a labor organization to use threats or coercion to force a neutral employer (such as Potlatch) to cease doing business with a primary employer (such as BE&K), but it does not prohibit the use of persuasion to achieve the same end. 29 U.S.C. § 187; 29 U.S.C. § 158(b)(4)(ii). It creates a private right of action against labor unions for damages, and limits recovery in such cases to actual, compensatory damages. 29 U.S.C. § 187. When Congress enacted section 303 it occupied the field of regulation of secondary activities and closed it to state regulation. Morton, 377 U.S. at 260-61.

States may, however, regulate union conduct, including secondary activity, that is marked by "violence and imminent threats to the public order." Gibbs, 383 U.S. at 721 (1966). State regulation in such cases is not preempted because of the "the compelling state interest in the maintenance of domestic peace." Id. (citing Garmon, 359 U.S. at 247). Any state remedies for secondary union activity must be "carefully limited" to the protection of the state's compelling interest, Gibbs, 383 U.S. at 730, in order to avoid state interference with the congressional determinations in section 303 on how best to balance the competing interests.

This is particularly true in a case such as this involving arguably protected union statements. Although section 303 makes certain union threats and coercion unlawful, threats or warnings that a union will engage in protected conduct such as handbilling or primary picketing are not a violation of federal law, and are in

16

fact protected by it.  See NLRB v. Servette, Inc., 377 U.S. 46, 54 (1964). Federal labor law encourages free debate on issues dividing labor and management and has long been characterized by a tolerance for robust union speech.  See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 270-73; Linn v. United Plant Guard Workers of America, 383 U.S. 53, 62 (1966).  Section 303 was carefully drawn to balance union rights with legitimate restrictions on threats and coercion, and state regulation cannot be allowed to interfere with that balance.  See Morton, 377 U.S. at 260-61.

The jury in this case was instructed that it must find that the Paperworkers' statements "involved or were marked by threats of violence," either express or implied, before it could consider the elements of the state tort claim.[10]  There is no allegation by BE&K that union violence actually occurred in McGehee or was imminent or that the union representatives explicitly referred to violence.  Its theory is that the union representatives intended to convey a threat of violence in order to eliminate BE&K from the Bel Bond project.  The parties agree that any such threat of violence must have been intended by the speaker, as determined from the statements themselves and the surrounding circumstances.  The issue is whether there was evidence capable of supporting an inference that the statements made at the October 24 meeting were intended to be threats of violence.

Neither International Falls nor the riot there was ever mentioned by anyone at the October 24 meeting, and there was no evidence that the union representatives were even aware of what had

---

[10]The content of this instruction is not challenged and we do not decide whether it was a sufficient statement of the law. The unions argue in the alternative for a new trial because the jury was not additionally instructed to consider only violent conduct when it calculated the amount of punitive damages.  See Gibbs, 383 U.S. at 735.  Dismissal of the state law claim will make this issue moot.

17

occurred there.  There was never any connection shown between any member of the Paperworkers and those events, nor was there evidence that the Carpenters union was involved in the riot.[11]  The fact that one person in attendance thought about International Falls is not proof of what the speakers themselves intended, especially given the content of the statements.  The testimony by all present at the meeting was that the statements made by the Paperworkers at the meeting were mild and that no one understood them to be intended as threats of violence.  There was no context at the meeting to suggest that such innocent terms as "pickets" or "problems" were code-worded threats.[12]

The only suggestion of union violence in the record concerned the unrelated riot at BE&K's workcamp in International Falls, Minnesota.  Even though no one at the October 24 meeting, including Richards, had been at International Falls or ever seen the seventeen minute videotape of riot scenes, it was introduced into evidence and shown to the jury.  The district court admitted the videotape to show  what Richards had in mind when he thought about the International Falls incident, but the videotape had

---

[11]Ironworkers Local Union 783 of Marquette, Michigan was found to have engaged in unfair labor practices related to the riot because it condoned and ratified violent conduct by its individual members who had travelled by bus to International Falls.  See BE&K Construction Co. v. NLRB, 23 F.3d 1459, 1470 (8th Cir. 1994), cert. denied, 115 S. Ct. 1195 (1995).

BE&K executive Kennedy testified that he had heard that two individual Carpenters members had been part of the riot, but there was no evidence that the union or the publicity campaign was involved or that those two men had anything to do with events in McGehee, Arkansas.

[12]BE&K suggests that references to picketing and handbilling relate to the Carpenters publicity campaign against it and raise violent connotations.  Picketing and handbilling are generally protected forms of union expression, however, and nothing in the record suggests that they were conducted unlawfully by the campaign or connects the Carpenters or its publicity campaign to any act of violence.

questionable probative value because the record did not contain evidence to support the necessary link to make it relevant. The legal focus for the preemption issue was what the Paperworkers intended to convey by their remarks at the Potlatch meeting, and there was no evidence to link the speakers with the 1989 riot or the images of it. Because of this and because of the prejudicial effect of the videotape, it was an abuse of discretion to admit it into evidence. See Fed. R. Evid. 402 and 403.[13]

The record contains uncontradicted testimony that no one at the meeting intended or understood the Paperworkers comments to be threats of violence or a riot. Although the jury could choose to discredit this testimony, BE&K offered no contrary evidence from which the jury could reasonably infer violence was threatened. There was no evidence of violence involving the Paperworkers, and undisputed evidence that the local unions and the Paperworkers maintained an ongoing positive working relationship with Potlatch. This was not a case involving a strike, a bargaining impasse, or any ongoing labor dispute, but rather comments made at a private meeting at which management and labor discussed matters of mutual interest.[14] The images of labor violence from elsewhere were used

---

[13]The prejudice factor is discussed infra at 23.

[14]The contrast between the facts here and those in cases where state law was not preempted is instructive. In Gibbs there was evidence that members of a local union forcibly prevented the opening of a mine, threatened the mine superintendent, and beat an organizer for a rival union. 383 U.S. at 721. In United Construction Workers, Affiliated with United Mine Workers of America v. Laburnum Construction Corp., 347 U.S. 656 (1954), work on a construction project was stopped when a large, boisterous crowd of union members arrived, some of them drunk, carrying guns and knives, and using abusive language. Id. at 660 n. 4. In Youngdahl v. Rainfair, Inc., 355 U.S. 131 (1957), strikers shouted abusive language at nonstriking employees and engaged in harassing conduct such as puncturing automobile tires, following the manager home, and making anonymous telephone calls. Id. at 133-34. In International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (UAW-CIO) v. Russell, 356 U.S. 634 (1958), there were allegations that picketers had blocked off a
street to prevent entrance to a plant and threatened bodily harm and damage to property. Id. at 636.

by BE&K to invite the jury to read them into the comments at the meeting.[15]

After a careful examination of the entire trial record, we conclude that there was insufficient evidence from which a reasonable jury could infer that the Paperworkers intended to suggest that they or their associates would resort to violence to get BE&K off the job.  Because of this lack of required proof, state tort law is preempted by federal labor law, and the Paperworkers are entitled to judgment in their favor on the state claim.[16]

D.

The Paperworkers argue that they are also entitled to judgment

---

[15]Since the Paperworkers are entitled to judgment as a matter of law on the state tort claim, which was the basis for the punitive damages award, it is not necessary to consider the requests for a new trial on the state claim or for remittitur. Nevertheless, it would appear that the very large punitive damage award of $20,000,000 was attributable to the admission of the riot videotape and the way that evidence was discussed in closing.  The award was far above the compensatory damages of $125,000 (160 times) in a case with no physical damage and little proven economic harm.  (BE&K claimed $82,249 in actual damages and an unspecified amount for lost profits from potential future contracts it might have been awarded by Potlatch.)  The statements at the meeting on which the claims were based were not the sort of misconduct generally associated with punitive damages.  When viewed in light of the factors courts find relevant, the award appears excessive.  See BMW of North America, Inc. v. Gore, 116 S. Ct. 1589, 1598 (1996); TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 403, 113 S. Ct. 2711, 2721-23 (1993); Pulla v. Amoco Oil Co., 72 F.3d 648, 658-60 (8th Cir. 1995).

[16]Because of this conclusion we need not reach the unions' argument that First Amendment implications require additional proof and more stringent review of the state tort claims or BE&K's argument that this issue was waived.

as a matter of law on BE&K's federal claim because there was insufficient evidence that their statements were unlawful secondary activity. BE&K's federal claim is brought under section 303(a) of the Labor Management Relations Act, 29 U.S.C. § 187(a), which creates a private right of action for damages resulting from certain union secondary activities.

Section 303(a) makes it unlawful for any labor organization "to engage in any activity or conduct defined as an unfair labor practice in [29 U.S.C. § 158(b)(4)]." 29 U.S.C. § 187(a). The referenced section, which is part of section 8(b) of the NLRA as amended, defines as an unfair labor practice certain secondary boycott activity, including actions to "threaten, coerce, or restrain any person engaged in commerce . . . where . . . an object thereof is . . . forcing or requiring any person . . . to cease doing business with any other person . . . ." 29 U.S.C. § 158(b)(4)(ii). It would be an unfair labor practice under § 158(b)(4(ii), and thus unlawful actionable activity under § 303(b), for the Paperworkers to threaten or coerce Potlatch with the purpose of forcing it to cease doing business with BE&K. See Ozark Interiors, Inc. v. Local 978 Carpenters, 957 F.2d 566, 568 (8th Cir. 1992).

Not all union activities directed at a secondary employer are defined as unfair labor practices. Even if the purpose of the activity is to force an employer to stop doing business with another, a union may attempt peacefully to persuade, induce, or encourage it to cease the relationship. NLRB v. Servette, Inc., 377 U.S. 46, 54 (1964) (conduct must be attended by threats, coercion or restraint); see also Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 578 (1988) (requirement of threats or coercion should not be interpreted broadly). A union has a right to engage in conduct such as peaceful handbilling of secondary employers or lawful primary picketing, and statements threatening protected conduct are

21

themselves protected.  See Servette, 377 U.S. at 57 ("statutory protections . . . would be undermined if a threat to engage in protected conduct were not itself protected").

The conduct in question is again the statements made by Barber, McFalls, and Bradshaw at the October 24 mutual interest meeting.  There is no question that the object of those statements was to convince Potlatch to cease doing business with BE&K.  The issue is whether there is evidence from which a jury could infer that those statements rose to the level of threats and that they were made to force Potlatch into action.

In cases involving ambiguous statements the line between lawful persuasion and unlawful threats is not easily drawn.  To determine whether particular statements constitute a prohibited threat, the specific language and the surrounding facts and circumstances are examined, not the subjective interpretation of the listener.  See, e.g., Apollo Drywall, 211 N.L.R.B. 291 (1974) (NLRB unfair labor practice decision); Champion Exposition Servs., 292 N.L.R.B. 794 (1989) (same).  Where there is inconsistent or conflicting evidence about what message was intended, there may be a fact question to be decided by a jury.  Ozark Interiors, 957 F.2d at 568-69 (ambiguous and conflicting testimony regarding threats of picketing created fact question for jury about intended message).

In addition to its argument that the Paperworkers statements were threats of violence, BE&K argued that they were intended as threats of other unlawful union conduct.  There was some evidence  that could imply that the union representatives may have been contemplating unlawful secondary picketing or other union conduct that might sour its relationship with Potlatch.  This could support a finding that they intended to threaten Potlatch with such action in order to force it to terminate its contract with BE&K, and the verdict could be upheld on this theory under the applicable deferential standard of review,  see Smith v. World Ins. Co., 38

22

F.3d 1456, 1460 (8th Cir. 1994), if it were not for the admission of the videotape.

BE&K's argument that the statements of the Paperworkers were threats of potential nonviolent action was not emphasized at trial or on appeal, for its primary argument was that the statements were actionable because they were intended to threaten violence if BE&K were to continue with the Bel Bond project.  Its theory on the federal claim was identical in this latter respect to the one asserted on the state claim and cannot succeed because of a lack of proof.  The jury's attention was directed to the images on the videotape of the International Falls riot, and we cannot conclude that the verdict was not based on this inadmissible evidence.

Although the videotape was ostensibly offered to show what Richards was thinking, counsel for BE&K argued in his closing that the tape would "terrify" anybody who saw it, and he implied that the Carpenters and Paperworkers were actually responsible for that riot:  "This is what they are doing.  And what happens is, they get International Falls." (Tr. 616).  He specifically asked the jury to send a message to "[t]hese large unions who go around the country doing things like International Falls . . . that the [publicity] campaign and the type of interference that they are doing is not permitted in this country."  (Tr. 646-47).  This argument was prejudicial and misleading, and any possible probative value of the videotape was outweighed by its prejudicial effect.  Fed. R. Evid. 403.

The videotape improperly focused attention on what took place in International Falls on September 9, 1989 instead of what was actually said at the October 24, 1991 meeting in McGehee, Arkansas.  Because it cannot be said with certainty that the verdict would have been the same without the videotape, its erroneous and prejudicial admission affected the substantial rights of the parties.  See Crane v. Crest Tankers, Inc., 47 F.3d 292, 296 (8th

23

Cir. 1995); <u>Hale v. Firestone Tire & Rubber Co.</u>, 756 F.2d 1322, 1333 (8th cir. 1985).  The judgment against the Paperworkers on the federal claim should therefore be reversed and the case remanded for a new trial on that claim.

V.

The judgments are reversed.  The claims against the Carpenters are dismissed due to insufficient evidence, and the state claim against the Paperworkers is dismissed because of federal preemption.[17]  The federal claim against the Paperworkers is remanded for a new trial.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

---

[17]BE&K moved to strike an affidavit submitted by the Paperworkers with its brief because it was not part of the record below.  Since the contents were not relevant to our analysis the motion is dismissed as moot.